# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. LEE, III, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 9245 |
| | ) | |
| v. | ) | Judge Joan Lefkow |
| | ) | |
| CHICAGO YOUTH CENTERS, an | ) | Magistrate Judge Jeffrey Cole |
| Illinois nonprofit corporation; and | ) | |
| J. HARRY WELLS, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff seeks to compel Chicago Youth Centers ("CYC") to produce certain documents, including his personnel file and a plan of reorganization for the CYC, that were attached to emails exchanged between CYC employee J. Harry Wells and CYC's previous counsel, Dia Morgan of the Chicago firm of Roger B. Derstine, Chartered. Initially, the defendant's claim was that the documents are immune from discovery under the attorney-client privilege. The plaintiff contends that his personnel file and the other attachments to the emails did not "bec[o]me cloaked with privilege" simply by virtue of having been sent to an attorney. And, apart from the argument on the merits, Mr. Lee contends that the defendants' privilege contentions have continually changed and were not supported by a proper privilege log, and thus, the claims of privilege are waived.[1]

---

[1] As an example of the evolutionary nature of the privilege claims, Mr. Lee notes that the defendants did not, until somewhat late in the game, invoke the work-product doctrine and the claim of inadvertent production – and not until the matter was suggested as a possibility by Mr. Lee's counsel. Mr. Lee's brief also argues that defendants submitted multiple privilege logs without identifying documents that they subsequently claimed to be privileged for the first time during a deposition when counsel instructed the
(continued...)

**FACTUAL BACKGROUND**

John Lee is a 64-year-old, African American male, who worked for CYC for 30 years until he was fired in 2011. He filed this employment discrimination action in November, 2012. and an amended complaint on March 21, 2013. (Dkt. 25). He served discovery requests in May 2013. For most of the ensuing year, he says, he has been stymied in obtaining compliance with his discovery requests. On July 2, 2013, Mr. Lee's counsel wrote to defense counsel, noting among other things the virtual absence of email and other electronically-stored information among defendants' document production. On July 16, 2013, defense counsel responded that "it does not appear that there was much in the way of email communication on these issues." (Dkt. 71, Exhibit 1).

In October, defense counsel wrote to Mr. Lee's counsel to confirm a search protocol for "90,000 emails received from the backup tapes." (Exhibit 2). Among the search terms was the following: "for privilege: Derstine and Dia Morgan." (*Id.* at 2). Ms. Morgan previously served as counsel for CYC. On October 17, 2013, Mr. Lee's counsel wrote to defense counsel regarding the search terms, objecting to the inclusion of the attorney names "if the point of these search terms is to withhold all documents on which the names of the identified attorneys appears." Defense counsel responded:

> The purpose of the search terms for privilege is to flag for review documents that are potentially privileged. For instance, any e-mail between CYC and its counsel, Dia Morgan, regarding "John" "Lee" which are "hit" search terms, will need to be reviewed for privilege and, if necessary, included in a privilege log.

(Exhibit 3, at 3).

On November 21st, the parties were directed to submit a proposed discovery schedule prior to the next scheduled status date on December 20, 2013. (Dkt. 56). Prior to the status hearing, Mr.

---

[1](...continued)
witness not to answer certain questions.

Lee's counsel again conferred with defense counsel regarding the ESI production in order to prepare a proposed discovery schedule in accordance with the court's direction. Defense counsel indicated that his office would "be able to produce … the electronic documents recovered from the back-up tapes by January 10th at the latest." (Exhibit 4). Accordingly, Mr. Lee's counsel submitted a proposed discovery schedule that recited that "Defense counsel has advised that defendants will be in a position to complete the production of documents, including electronically stored information, on or before January 10, 2014." (Dkt. No. 58). The schedule was approved on December 20th. (Dkt. 59).

On January 13th, having received no production of ESI, Mr. Lee's counsel again made inquiry of defense counsel, who agreed to make the responsive production by January 20th. (Exhibit 5). On Thursday, January 16, 2014, defense counsel wrote to Mr. Lee's counsel to advise that additional time would be necessary to make the required production. In this email, defense counsel indicated that the production would be forthcoming on January 22nd. (Exhibit 6).

On January 22th, defense counsel turned over a DVD containing approximately 6,000 pages of responsive ESI. No privilege log accompanied this production. (Exhibit 7). On the 23rd, defense counsel wrote to Mr. Lee's counsel to advise that he anticipated "serving Plaintiff with the ESI privilege log sometime next week" – *i.e.*, by Friday, January 31st. (Exhibit 8).

On February 4th, having received no privilege log, Mr. Lee's counsel wrote to defense counsel. (Exhibit 9). The next day, defense counsel produced a 5-page privilege log, captioned "First Privilege Log/Assertion"). (Exhibit 10). Two days later, Mr. Lee's counsel again wrote to defense counsel raising concerns about the privilege log, including the failure to identify the privilege being asserted, the failure to identify several attachments being withheld, and the failure to identify the

individuals to whom the withheld materials were sent. With commendable candor, the email also raised the possibility that there had been an inadvertent production of documents as to which defense counsel may have intended to assert a claim of privilege. [2]

On February 10th, defense counsel confirmed that the privilege being claimed for the materials withheld from the January 22nd supplemental production was the attorney-client privilege. (Exhibit 12). On February 11th, defense counsel wrote to Mr. Lee's counsel, stating that "[i]t has also been brought to our attention that certain documents included in our production, Bates Nos. CYC0000739-741, 757-764, 891-896, 901-908, 1115-1117, 5239-5241, 5509-5517 and 5621-5626, were inadvertently produced with CYC's production of documents." (Exhibit 13) (defendants' "Second Privilege Log/Assertion"). Mr. Lee's counsel then segregated the identified materials and contacted Mr. Lee to ensure their immediate return. (Exhibit 14).

On February 20th, a third privilege log was offered, which, in addition to identifying the documents in the Second Privilege Log, now included "John Lee's Personnel File with Evaluations and Transaction Data showing Work History." Defendants asserted that these attachments constituted attorney work product. (Exhibit 15).[3]

---

[2] The email identified the materials of possible concern:

> Finally, although it is not possible to tell with certainty because of the problems noted above, I have concerns that there may have been an inadvertent production of materials that you intended to withhold under a claim of privilege. Certain of the materials that have been produced (*e.g.*, email correspondence with Dia Morgan) seem similar to those described on your log. While I do not believe these communications are privileged, I want you to be aware of the production, and suggest that you conduct a second review of the supplemental production for privilege.

(Exhibit 11).

[3] As we shall see, claiming any sort of privilege for the plaintiff's own personnel file was "a
(continued...)

On February 28th, Mr. Lee's counsel wrote expressing concern about aspects of the Third Privilege Log, including the new designation of the plaintiff's personnel file as being protected by the work-product doctrine and the withholding of various documents merely because they were sent to an attorney. (Exhibit 16). On March 4th defendants produced certain of the withheld attachments, but refused to address others. (Exhibit 17). A "Fourth Privilege Log" accompanied this email. Since then, however, the defendants have rather inconsistently with the claim of privilege – but quite rightly – produced some 800 pages of materials from or relating to Mr. Lee's personnel file.

The deposition of defendant Wells occurred on March 11th. By then, defendants had produced four separate logs for the ESI production, none of which included documents for which the defendants claimed privilege at and following the Wells deposition. During that deposition, plaintiff's counsel claims the defendants asserted a claim of privilege for the first time with respect to two deposition exhibits (Exhs. 22 and 35) and instructed the witness not to answer questions regarding these materials. Defense counsel confirmed this privilege assertion in his letter of March 21 and identified additional materials that defendants now were claiming were privileged, but which, it is claimed, were "inadvertently produced." (Exhibit 19). In short, there were now multiple iterations of the privilege log.

**ARGUMENT**

**A.**
**The Attorney Client Privilege**

The attorney-client privilege is the oldest of the recognized privileges for confidential communications known to the common law. *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996); *Upjohn Co.*

---

[3](...continued)
preposterous argument." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004).

*v. United States,* 449 U.S. 383, 389 (1981). Deeply rooted in public policy, *In re Ford Motor Co.*, 110 F.3d 954, 966 (3rd Cir.1997), and playing a "vital role" in the administration of justice, *American Nat. Bank and Trust Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 878 (7th Cir.2005), the privilege's central concern – and its ultimate justification – is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice. *United States. v. Jicarilla Apache Nation,* _U.S._, 131 S.Ct. 2313, 2320 (2011); *Upjohn*, 449 U.S. at 389.

The protection of the privilege extends to confidential communications made by a client to his lawyer in order to obtain legal advice. *United States v. Leonard-Allen,* 739 F.3d 948, 952 (7th Cir.2013); *Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir.2000). [4] Although the privilege is deemed generally to apply only to communications by the client, statements made by the lawyer to the client will be protected where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client. *Rehling,* 207 F.3d at 1019. Knowing disclosure to a third party almost invariably surrenders the privilege. *United States v. Nobles,* 422 U.S. 225, 239 (1975); *United States v. Brock*, 724 F.3d 817, 821 (7th Cir. 2013). This is so despite the client's subjective intention that it not be waived. *Jenkins*, 487 F.3d at 490.

It cannot be too strongly emphasized that the lawyer-client relationship, itself, "does not

---

[4] Documents prepared for business purposes, rather than seeking legal advice, are not protected by the privilege. *Miller UK Ltd. v. Caterpillar, Inc.*, --- F. Supp. 2d ---, 2014 WL 67340, *11 (N.D. Ill. 2014); *RBS Citizens, N.A. v. Husain,* 291 F.R.D. 209, 217 (N.D.Ill.2013). Of course, legal advice relating to business matters is protected. *Sullivan v. Alcatel–Lucent USA, Inc.*, 2013 WL 2637936, 2 (N.D.Ill.2013). *See also Sandra T.E. v. South Berwyn School Dist.*600 F.3d 612, 620 (7th Cir.2010).

create 'a cloak of protection which is draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client.'" *In re Walsh*, 623 F.2d 489, 494 (7th Cir. 1980). Thus, merely communicating with a lawyer or copying a lawyer on an otherwise non-privileged communication, will not transform the non-privileged communication or attachment into a privileged one. And that is so even if the otherwise non-privileged communication was at the behest of the lawyer. *See Bell Microproducts, Inc. v. Relational Funding Corp.*, 2002 WL 31133195, at *1 (N.D.Ill. 2002)(instruction from an attorney to employees to copy him as a recipient on any emails or documents in order to assure attorney-client privilege was not by itself enough to make the document privileged).

These principles have been repeatedly adhered to by courts throughout the nation. *See, e.g., In re Avantel, S.A.*, 343 F.3d 311, 321, n. 11 (5th Cir.2003); *Stopka v. American Family Mutual Ins. Co.*, 816 F.Supp.2d 516, 528 (N.D.Ill. 2011); *Tect Aerospace Wellington, Inc. v. ThyssenKrupp Materials NA, Inc.*, 2009 WL 1313230, 2 (D.Kan. 2009); *In re Human Tissue Products Liability Litigation,* 255 F.R.D. 151, 164 (D.N.J. 2008); *Steele v. Lincoln Financial Group*, 2007 WL 1052495 at *2 (N.D.Ill. 2007); *Fru-Con Const. Corp. v. Sacramento Mun. Utility Dist.*, 2006 WL 2255538, at *2 (E.D.Cal. 2006); *U.S. ex rel. Fields v. Sherman Health Systems*, 2004 WL 905934 at *2 (N.D.Ill. 2004).

Thus, while a client cannot be compelled to answer the question, "what did you say to your attorney," he may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney. From this it follows that the privilege would never be construed to allow a client to funnel papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure. *Radiant Burners, Inc. v.*

*American Gas Ass'n* 320 F.2d 314, 324 (7th Cir. 1963). If the result were otherwise, unscrupulous clients and lawyers could have all relevant documents sent to their counsel initially or as attachments to emails and then refuse to honor a single Rule 34 request. *Id*. The privilege is not so easily perverted. *Northern Valley Communications, L.L.C. v. Qwest Communications Corp.*, 2010 WL 3672233, 4 (D.S.D. 2010)("simply including an attorney in a communication will not render an otherwise discoverable document protected by the privilege. The courts will not permit the corporation to merely funnel papers through the attorney in order to assert the privilege...."). *Cf., McCullough v. Fraternal Order of Police, Chicago Lodge 7*, 2014 WL 2514623, 3 (N.D.Ill.2014) ("And simply copying a lawyer on an otherwise non-privileged communication will not transform the non-privileged document into a privileged one.")(collecting cases).

From these fundamental principles, it inexorably follows that sending an otherwise non-privileged document to a lawyer in connection with a request for legal advice will not make the attached document independently privileged and immune from discovery, even though the communication seeking legal advice is privileged. *RBS Citizens, N.A. v. Husain,* 291 F.R.D. 209, 221 (N.D.Ill.2013)(attachments to emails are judged separately from their primary documents and that to be withheld each must individually meet the privilege ). As the Court in *Upjohn* stressed: "[t]he privilege only protects disclosure of communications," not facts. "A fact is one thing and a communication concerning that fact is an entirely different thing.'" 449 U.S. at 395-96.

Because the privilege, like all testimonial privileges and all exclusionary rules, makes the search for truth more difficult by preventing disclosure of what is often exceedingly relevant and probative information, it is narrowly construed and is limited to those instances where it is necessary to achieve its purposes. *Leonard-Allen,* 739 F.3d at 952. *See also See Pierce County, Wash. v.*

*Guillen*, 537 U.S. 129, 144–145 (2003); *Fisher v. United States*, 425 U.S. 391, 403 (1976)("'Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth.'").[5] The position for which the defendants contend (or at least initially contended) would impermissibly work a substantial expansion of the attorney/client privilege and the work-product doctrine on which the defendants also rely.

**B**.

**The Work-Product Doctrine**

The work-product doctrine establishes a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary. *Sandra T.E. v. South Berwyn Sch. Dist. 100,* 600 F.3d 612, 618 (7th Cir.2010). Its protection is "distinct from and broader than the attorney-client privilege." *United States v. Nobles,* 422 U.S. 225, 238 n. 11 (1975). It protects "documents ... prepared in anticipation of litigation or for trial by or for another party or its representative" for the purpose of analyzing and preparing a client's case. Rule 26(b)(3), Federal Rules of Civil Procedure. A lawsuit need not be underway for the doctrine to apply "provided the prospect of litigation [is] not remote." *Mattenson v. Baxter Healthcare Corp.,* 438 F.3d 763, 768 (7th Cir.2006). The core of attorney work product consists of "the mental impressions, conclusions,

---

[5] *Radiant Burners,* 320 F.2d at 323, adopted Wigmore's narrow view of the privilege:

> Nevertheless, the privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative; its obstruction is plain and concrete. Even the answers to Bentham's argument concede that the privilege is well founded in its application to a certain proportion of cases. It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.

9

opinions, or legal theories of a party's attorney or other representative concerning the litigation." Rule 26(b)(3)(B). Materials containing this information "are out of bounds...." *Mattenson v. Baxter Healthcare Corp.* 438 F.3d 763, 768 (7th Cir.2006).

Underlying the doctrine is the deeply felt notion that the opposing party "shouldn't be allowed to take a free ride on the other party's research, or get the inside dope on that party's strategy, or ... invite the [trier of fact] to treat candid internal assessments of a party's legal vulnerabilities as admissions of guilt." *Menasha Corp. v. U.S. Dept. of Justice,* 707 F.3d 846, 847 (7th Cir.2013). Justice Jackson has said it best: opposing counsel should not be permitted "to perform [their] functions ... on wits borrowed from their adversary." *Hickman v. Taylor,* 329 U.S. 495, 516 (1947)(Jackson, J., concurring).

However, work-product protection only prevents the disclosure of protected documents or communications, not the underlying facts. *Upjohn,* 449 U.S. at 395–96. It is the burden of the party seeking work-product protection to establish its applicability to the documents claimed to be protected. *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,* 318 F.3d 379, 384 (2nd Cir.2003).

Like the attorney/client privilege, the work-product doctrine interferes with the public's right to obtain evidence, and thus must be strictly construed and accepted "'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel v. United States,* 445 U.S. 40, 50 (1980). *See also Howell v. City of New York,* 2007 WL 2815738, 1 (E.D.N.Y.2007).

## C.

Defendants have invoked, belatedly and quite improperly the plaintiff contends, the work product doctrine to shield from production the plaintiff's personnel file and certain email attachments that were not prepared by or at the behest of an attorney, let alone in anticipation of litigation.[6] Thus, by definition there can be no work product protection for those documents. The defendants neither cite a case for the proposition that personnel records are within the ambit of the work product doctrine, nor do they attempt to explain how the plaintiff's personnel file, prepared over three decades of employment, somehow becomes attorney work-product.

Personnel records, even of third parties, are a legitimate category of confidential information; barring exceptional circumstances they are discoverable in discrimination cases. *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1519 (9th Cir.1987). *See also, Brunker v. Schwan's Home Service, Inc.*, 583 F.3d 1004, 1010 (7th Cir.2009); *Vukadinovich v. Griffith Public Schools,* 2008 WL 5141388, 9 (N.D.Ind. 2008)*; Hogdon v. Northwestern University*, 245 F.R.D. 337, 341 (N.D.Ill.2007); *Vodak v. City of Chicago,* 2004 WL 1381043, 5 (N.D.Ill.2004). It is idle to suggest, as the defendant did until quite recently, that a plaintiff's own personnel file, compiled over a 30-year career with CYC, is out of bounds under either the attorney/client privilege or work-product doctrine.

---

[6] For example, on the first page of defendants' Third and Fourth Privilege Logs, defendants identify Mr. Lee's personnel file, and claim that it constitutes attorney work product because it was sent to a CYC attorney. (Exhibits 15 & 17). The defendants have made no attempt to show that these documents were prepared in anticipation of litigation, even though they have the burden to do so. It is not the court's job to make the case for a party. *Alioto v. Town Of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011); *Burdett v. Miller,* 957 F.2d 1375, 1380 (7th Cir.1992).

The defendants' seven-page response brief cites only one case, *Muro v. Target Corp.*, 250 F.R.D. 350 (N.D.Ill. 2007), which they say supports their argument that the "version" of the plaintiff's personnel record and other documents – that were prepared in the course of the CYC's business – are not producible since they were attached to an email to CYC lawyers, which the defendants contend were, themselves, protected by the attorney/client privilege.

The issue in *Muro* was whether all the components of an email string had to be separately logged. The court held that they did not. *Contra, Helm v. Alderwoods Group, Inc.*, 2010 WL 2951871 (N.D.Cal. 2010). But *Muro* explicitly recognized that while "the fact that [non-privileged] documents were attached may be privileged," the "originals" are not privileged. 250 F.R.D. at 363 n.21. Thus, properly read, *Muro* recognized the unassailable proposition that simply attaching an unprivileged document to an otherwise privileged communication to a lawyer does not draw a conjurer's circle around the attachment. *See, e.g., Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615 (D.Nev. 2013).

**D.**

**The Defendants' *In Camera* Submission**

The defendants have submitted for *in camera* review 16 exhibits, consisting of emails, generally 1 or 2 lines long, between Ms. Morgan and Mr. Wells. Despite having claimed on the privilege logs that the attachments are protected by the work product doctrine, the defendants have belatedly but wisely conceded that the attachments are not immune from discovery and have produced them. However, they continue to insist that the emails, themselves, need not be produced as they are protected by the attorney-client privilege. They are not. What the defendants fail to recognize is that not every communication between a client and attorney is privileged. In addition

to the cases discussed *supra* at 7-8, *see Sparton Corp. v. United States,* 44 Fed. Cl. 557, 566 (1999); *In re Grand Jury Investigation*, 599 F.2d 1224, 1234 (3rd Cir. 1979). Unless the communication between the lawyer and client is made in confidence for the purpose of obtaining legal advice, the privilege does not apply. *Upjohn, supra.*

The Second Circuit's opinion in *United States v. Walker,* 243 Fed.Appx. 621 (2nd Cir. 2007) puts the matter in this case in proper focus:

> The same is true as to the remainder of the 170 documents, which were composed chiefly of various form printouts summarizing PCA's contracts. Even assuming the documents (or the handful of corrections and clarifications handwritten thereon) were work product or were privileged, they contain solely factual information about PCA's business, and shed no light on Walker's confidential communications with counsel or defense strategy. Moreover, we agree with the district court that these documents were neither work product nor attorney-client communications. The attorney-client privilege protects from disclosure the contents of confidential attorney-client communications, but does not prevent disclosure from the client's records the underlying factual information included in attorney-client communications. *See Upjohn Co. v. United States....* For this reason, putting otherwise non-privileged business records (like the contract summaries here) in the hands of an attorney-or printing out such records for an attorney to review-does not render the documents privileged or work product. *See Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170-71 (2d Cir.2003) ("Documents obtain no special protection because they are housed in a law firm; '[a]ny other rule would permit a person to prevent disclosure of any of his papers by the simple expedient of keeping them in the possession of his attorney.'")....

243 Fed.Appx. at 624.[7]

1. Exhibit 1 is an e-mail from Mr. Wells to Ms. Morgan, re: senior management job descriptions, enclosing "the job descriptions." The email does not ask for legal advice; it is a simple

---

[7] Even communications from counsel do not become automatically immune from discovery as work product on the theory that the selection and compilation of documents would show counsel's theories. It is only when there is "a real, rather than speculative, concern that counsel's thought processes in relation to pending or anticipated litigation will be exposed through disclosure of the compiled documents" that the communication becomes protected work product. *In re Grand Jury Subpoenas*, 318 F.3d at 386.

description of what is in the attachment: "V.P. operations includes an MPA as possible degrees [sic] for qualification." Ms. Morgan's terse, responsive email is not privileged since it gives no legal advice. It simply notes that she would like to ask him some questions.

2. Exhibit 2 is a February 7, 2011 four-line email from Mr. Wells to Ms. Morgan and her two-line response the same day re: "CYC Reorganization Plan." The second sentence of Mr. Wells' email is privileged. The balance is not; nor is Ms. Morgan's response, as it gives no legal advice or reveals the substance of any confidential communication.

3. Exhibit 3 is a December 22, 2010 email from Mr. Wells to Ms. Morgan enclosing evaluations of Mr. Lee. The email does not seek legal advice and is not privileged.

4. Exhibit 4 is a February 9, 2011 email from Ms. Morgan to Mr. Wells re: "CYC Reorganization" asking that he perform a particular analysis for her. This email is arguably privileged and need not be produced. Mr. Wells' email to a colleague asking him to perform the analysis and Mr. Wells' email enclosing the schedule is arguably privileged. As with all of the attachments, this particular attachment is producible although the emails are not.

5. Exhibit 5 is a February 22, 2011 email from Mr. Wells to Ms. Morgan "re: Finance Committee Minutes." The email does not seek legal advice, but merely asks her to give "the preferred language" if revisions to the minutes are deemed desirable. The email is not privileged as editorial changes or contributions by a lawyer do not qualify under the attorney/client privilege. *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 270 F.R.D. 312, 314-16 (N.D. Ill. 2010).

6. Exhibit 6 is a series of emails. The January 7, 2011 email from Ms. Morgan to Mr. Wells merely encloses the job descriptions and points out the qualifications of the VP for program operations. This email is not privileged as it does not ask for legal advice. Ms. Morgan's somewhat

14

lengthy response of the same day is arguably privileged.

7. Exhibit 7 is a February 10, 2011 email from Ms. Morgan to Mr. Wells "re: Reorganization Plan" regarding her draft of a revised text for use in a section of a budget document entitled, "Elimination of the Position of Vice President of Administration," for Mr. Wells to consider incorporating in the "revised CYC Budget Reduction And Reorganization Plan for 2012." This is not the giving of legal advice but an editorial contribution to a business document of CYC and thus is not privileged. Moreover, it was intended, if Mr. Wells chose, to be published to third parties as part of the reorganization plan and not being intended to remain confidential, was not privileged.

8. Exhibit 8 is a January 7, 2011 email from Mr. Wells to Ms. Morgan re: Senior Management Job Descriptions. It encloses job descriptions and notes that "VP for Program Operations" includes an MPA as possible degrees for qualification." This email does not seek legal advice and is not privileged.

9. Exhibit 9 is a January 12, 2011 email from Mr. Wells to Ms. Morgan re: "revised VP of Program Operations job description" effective July 1, 2011. The email is essentially blank and is clearly not privileged.

10. Exhibit 10 is a February 15, 2011 email from Mr. Wells to Ms. Morgan. The email says nothing and clearly does not ask for legal advice. Like 9, it is not privileged.

11. Exhibit 11 is a January 7, 2011 email that also says nothing. Like Exhibit 10, there is no basis to claim privilege for the email.

12. Exhibit 12 is a February 7, 2011 email, which informs Ms. Morgan that the Executive Committee is considering the full package and asks her to make whatever changes she desires to the "CYC Reorganization Plan." Like the earlier emails inviting editorial changes to administrative and

15

program operations, budget reduction and reorganizations plans, the email does not seek legal advice and is not privileged.

14. Exhibit 13 is a February 9, 2011 email from Mr. Wells to Ms. Morgan in which he merely notifies her of some internal editorial changes that he made to the VP of Program Operations position description. It does not seek legal advice of any kind and plainly is not privileged.

14. Exhibit 14 is a February 17, 2011 email from Mr. Wells to Ms. Lusk-Basick referencing and attaching an invoice from Ms. Morgan's law office for services rendered. Neither the email nor the attached bill reveals any confidential communication or involves a request for legal advice. "'Courts have consistently held that the general subject matters of clients' representations are not privileged.'" *Avgoustis v. Shinseki,* 639 F.3d 1340, 1344 (Fed. Cir. 2011). *See also United States v. Under Seal ( In re Grand Jury Subpoena),* 204 F.3d 516, 520 (4th Cir.2000) ("the general purpose of the work performed [is] usually not protected from disclosure by the attorney-client privilege because such information ordinarily reveals no confidential professional communications between attorney and client"). Exhibit 14, which reveals no confidential client communications, falls within this category and is not privileged.

15. Exhibit 15 is a January 11, 2011 two-sentence email from Mr. Wells to Ms. Morgan re: "New Position Descriptions" for three positions to be effective July 1, 2011. This email merely informs Ms. Morgan of "small" editorial changes in the job descriptions. It does not seek her legal advice and is not privileged.

16. Exhibit 16 is a February 10, 2011, two-sentence email from Mr. Wells to Ms. Morgan complimenting her on the editorial changes she apparently recommended to the Administrative And Program Operations Budget Reduction And Reorganization Plan 2.10.11. The email does not seek

16

legal advice nor does it reveal confidential communications of the client. It simply acknowledges the editorial changes Ms. Morgan made to business documents, which the defendants note have now been turned over to the plaintiff.

### D.

### The Claim That The Defendants Have Waived Any Protection For the Withheld Documents

Finally, Mr. Lee argues at some length and not unpersuasively that the defendants' untimely, inadequate and changing privilege logs should result in a waiver of any claim of privilege or inadvertent disclosure. In light of the disposition of the plaintiff's motion, it is unnecessary to reach these questions.

### CONCLUSION

It is the plaintiff's theory that the defendants' justifications for his firing involved *post hoc* manipulations of the qualifications for the job that Mr. Lee was supposedly unqualified for. Plaintiff is entitled to pursue that theory, unhampered by captious objections to proper discovery requests and impermissible and strained interpretations of the attorney/client privilege and work-product doctrine. The plaintiff's motion to compel [66] is granted.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/10/14