IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. LEE, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 9245 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| CHICAGO YOUTH CENTERS and | ) | |
| J. HARRY WELLS, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## **OPINION AND ORDER**

John W. Lee, III filed suit against his former employer, Chicago Youth Centers (CYC), and its former Chief Executive Officer (CEO), J. Harry Wells, alleging that they discriminated against him based on his race in violation of 42 U.S.C. § 1981 (counts I–IV) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* (Title VII) (counts V–VII) and based on his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA) (counts VIII–IX). He also claims against Wells, tortious interference with a contract (count X) and business expectancy (count XI) under Illinois common law. (Dkt. 25.) Defendants moved for summary judgment on all counts. (Dkt. 137.) For the reasons stated below, defendants' motion for summary judgment is granted in part and denied in part.

# BACKGROUND[1]

CYC is a non-profit corporation that provides social services to low-income and at-risk children in Chicago who are predominantly African-American and Hispanic. (Dkt. 139, Defendants' Local Rule 56.1 Statement of Undisputed Material Facts (Defs.' LR 56.1) ¶ 1.) John Lee, a sixty-one-year-old African-American man, was CYC's Senior Vice President of Administration until he was terminated from that position effective June 30, 2011. (*Id.* ¶ 3; Dkt. 155, Plaintiff's Local Rule 56.1 Statement of Additional Material Facts (Pl.'s LR 56.1) ¶¶ 9, 15.) At the time of Lee's termination, J. Harry Wells, who is white, was CYC's CEO. (Defs.' LR 56.1 ¶ 2.) Lee had worked at CYC for thirty years in a variety of positions: Director of Personnel (1981–1982), Director of Program Operations (1982–1984), Senior Vice President and Chief Operating Officer (COO) (1984–2004), and Senior Vice President of Administration

---

[1] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

Lee moved to strike certain arguments that he believed defendants improperly raised for the first time in their reply brief. (Dkt. 164.) The court granted that motion (dkt. 165), but after doing so received a motion for reconsideration from defendants (dkt. 167). The court received defendants' motion for reconsideration as a response to Lee's motion to strike and decided to take the motion to strike under advisement with defendants' motion for summary judgment. (Dkt. 169.) Lee moved to strike defendants arguments in its reply brief regarding (1) net assets, (2) the admissibility of Lee's proffered expert testimony, (3) the admissibility of the testimony of three former CYC employees, Rosie Henderson, Bettye Gill, and Sequance Lawrence, and (4) defendants' factual support arguments relating to Lee's tortious interference claims. (Dkt. 164.) As discussed below, the court need not address defendants' argument relating to CYC's net assets or Lee's proffering of expert testimony to resolve defendants' motion for summary judgment. Those portions of the motion to strike are therefore denied as moot. While certain statements of the three former CYC employees may be inadmissible because specific parts of their testimony are excluded by the Federal Rules of Evidence, the court rejects defendants' argument that their testimony is generally not admissible because it is unfounded and, therefore, the motion to strike that argument is denied as moot as well.

(2004–2011).[2] (*Id.* ¶¶ 5, 11.) In 2011, Lee was paid $155,283 but with benefits his compensation rose to $170,996. (*Id.* ¶ 17.) William Hansen was the Vice President of Program Operations. His salary was $125,196 and with benefits $145,424. (*Id.*) The Chief Financial Officer (CFO) Kari Lusk-Basick's salary was approximately $110,000. (*Id.*) Other than Lee, all of CYC's senior managers were white. (Pl.'s LR 56.1 ¶ 24.) Lee, Wells, Hansen, and Lusk-Basick were four of the five members of the senior management team.[3]

The issue is whether Lee was discriminated against based on his race and age when his position was eliminated and his pension was reduced. Defendants deny that they discriminated against Lee and justify their actions as necessary business decisions arising from CYC's financial condition at the time. The earliest evidence of defendants' rationale for terminating Lee is an October 26, 2010 email from Wells to Board Chairman Wiertel, past Board Chairman Steve Zuccarini, and Treasurer, Pat Delacey, in which Wells states:

> I wanted to let all of you know that as part of serious scenario planning for worst-case scenarios regarding the FY 12 budget, I am seriously considering the elimination of the Vice President for Administration position, filled by John Lee. If necessary to keep Camp and EDYC open it would be better to eliminate this position and distribute the three major segments of this job to the CEO for Facilities, the CFO for HR and the VP of Operations for Camp. Needless to say this is not a preferable choice, but the realities of the state, the UW, no earmark and reduced portfolio income may necessitate this change effective June 30, 2011. If this comes to pass I would advocate for a generous severance for this very dedicated 28 year leader.

---

[2] While Lee was CYC's Senior Vice President and COO he was responsible for directing and managing all program operations and program grant funding. (Defs. LR 56.1 ¶ 5.) Lee was also CYC's interim President and CEO from September 2003–July 2004. (Lee's LR 56.1 ¶ 8.)

[3] Beth Carona, Vice President of Development, appears to have been the fifth member, but neither of the parties discusses her. (*See* Defs.' LR 56.1, Ex. C, Wells Tr., Dep. Ex. 38 at 1; *see also id.*, Ex. C, Wells Tr., Dep. Ex. 1 at 1.)

(Defs.' LR 56.1, Ex. C, Wells Tr., Dep. Ex. 25.) The following month, at an annual meeting, Wells reported that CYC was "on track to have a break-even year for FY11 and we will do what we must to have FY 12 produce a small surplus so we can begin to return some of the losses of the last three years. More importantly I want to see CYC resume paying to our hard working staff and to contribute to the employer matching for the 403-b pension plan." (*Id.*, Ex. C, Wells Tr., Dep. Ex. 38 at 2.) Nonetheless, on December 17, 2010, Wells sent another email to Wiertel, which in relevant part states:

> We need to reduce costs in the senior management level and the program management level. This is necessary to maintain direct service capability and not reduce services to kids. The VP Administration job is highly conducive to being divided into three parts (HR, Facility and Camp) and place[d] with Kari, me and Bill, respectively. John is by far the most expensive element of management and will have the best impact on savings. We cannot run the agency without a CFO, a CDO or a VP for Program. We can take over John's responsibilities, even though it will be a taxing burden for the remainder senior staff, it can be done.

(*Id.* ¶ 42 (quoting Ex. C, Wells Tr., Dep. Ex. 28.)) Following this exchange, defendants proceeded to draft a written reorganization plan, which called for the elimination of Lee's position. A draft of the reorganization plan was provided to the Executive Committee on January 26, 2011, in advance of a February 1, 2011 Executive Committee meeting. (*Id.* ¶ 47.) Prior to a February 14, 2011 meeting, the Executive Committee received the final version of the reorganization plan (*id.* ¶ 49), which recommended that Lee's position be eliminated, basing that recommendation "on an analysis of the current duties and responsibilities of the agency's five senior management staff positions." (*Id.* ¶ 50 (quoting Ex. C, Wells Tr., Ex. 1).) The plan concluded that Lee's was "the only position with duties and responsibilities that could be fully assumed by other senior management staff if the position was eliminated." (*Id.*) In its discussion of the Vice President of Program Operations position, the reorganization plan

4

concluded that none of the remaining senior staff has the educational background to perform two of the position's key functions: "(1) provision of clinical supervision to among others, the Director of Mentor Services, and (2) oversight of both procurement and administration of grants from federal, state and local government agencies." (*Id.*) As to Lee's position, the reorganization plan noted, in line with Wells's January 26, 2011 email, that there were director positions that would remain intact for that position's three areas of responsibility, and that the President & CEO, Vice President of Finance & CFO, and Vice President of Program Operations would assume those oversight responsibilities. (*Id.*) Ultimately, the reorganization plan concluded that eliminating Lee's position would result in a net savings of $171,404 for fiscal year 2012. (*Id.*, Ex. C, Wells Tr., Dep. Ex. 1.) At that February 14, 2011 meeting, the Executive Committee approved the reorganization plan, eliminating Lee's position. (*Id.* ¶ 49.)

In addition to Lee's termination, his pension was reduced. In March of 2011, CYC applied to the Pension Benefit Guaranty Corporations (PBGC) for a distress termination of its pension plan. (*Id.* ¶ 72.)[4] At the time CYC submitted this application, Lusk-Basick, its CFO, was concerned that CYC would run out of money and that it would have to begin to shut down its operations. (Defs.' LR 56.1 ¶ 72;[5] *id.*, Ex. D, Lusk-Basick Tr. at 174:21–175:3.) Prior to seeking the reduction, Lusk-Basick and Wells prepared a document explaining the rationale for the distress termination and identifying the employees who would be affected. (*See id.* ¶ 73; *see also id.*, Ex. D, Lusk-Basick Tr., Dep. Ex. 2.) The document identified three employees (two

---

[4] It appears that Wells ultimately recommended eliminating Lee's position and seeking a distress termination of the pension. Both recommendations were approved by CYC's Board. (*See id.* ¶¶ 73, 77.)

[5] While Lee disputes this fact, the evidence that he cites in support of that dispute raises issues only as to the whether the opinion has a basis in fact, not whether Lusk-Basick actually had this concern. (*See* Pl.'s Resp. LR 56.1 ¶ 72.)

who are relevant here) whose pensions were above the maximum allowed by the PBGC. (*Id.*, Ex. D, Lusk-Basick Tr., Dep. Ex. 2.) For Lee that meant upon retirement his pension would be reduced from $87,000 to $54,000 per year (Lee's maximum based on his age and years of service) and that if Hansen were to retire at age 62, his pension would be reduced from $53,565 to $42,000 per year (Hansen's maximum based on his age and years of service). (*Id.*)[6] According to Lusk-Basick, before deciding to apply for a distress termination the board was interested in knowing who might be affected by the distress termination (Defs.' LR 56.1, Ex. D, Lusk-Basick Tr. at 105:24–107:9), and she relayed to the board that Lee was the only employee who would be "significantly affected." (Pl.'s LR 56.1 ¶ 38; Defs.' LR 56.1, Ex. D, Lusk-Basick Tr. at 110:20–111:1.) On May 18, 2011, the PBGC approved CYC's application for a distress termination. (Defs.' LR 56.1 ¶ 76.)

In addition to the details surrounding his termination and the reduction of his pension, Lee also alleges a racially discriminatory environment. Although prior to Lee's departure CYC's senior management team included one African-American and four white employees, CYC's staff employees were overwhelmingly African-American. Lee cites examples of Wells's conduct that offended Lee and other CYC employees. Lee primarily relies on three incidents to describe the discriminatory environment at CYC.

The first of these incidents is Wells's performance of a song at an agency-wide staff meeting in 2008 or 2009. (Dkt. 153 at 12.) The parties' accounts of this event differ, but Lee's must be accepted as true for purposes of the motion. Lee cites testimony that indicates that the song was a racially offensive "Negro spiritual" accompanied by vernacular changes and bodily

---

[6] Apparently Hansen's lower maximum was the result of his not being within three years of retirement age at the time of the distress termination. (*Id.*) Each was also entitled to additional funds as a result of existing cash balances that may have been affected by the distress termination as well. (*Id.*)

6

movements of an early twentieth century rendition that offended members of CYC's staff. (*See, e.g.*, Pl.'s LR 56.1 ¶ 91.) Next, Lee points to remarks Wells made when Lee returned from a trip: "[Y]ou've been to Tennessee and so you got a chance to get you some watermelon and some fried chicken and some collard greens." (Pl.'s LR 56.1 ¶ 98.) The third incident was Wells's recommendation of a book to Lee about the migration of African-Americans from the South to the North. (Dkt. 153 at 13; *see also* Pl.'s LR 56.1 ¶ 110.) Lee was offended by Wells's recommendation because, as Lee commented in his deposition testimony, he is "the migration." (Pl.'s Resp. LR 56.1 ¶ 23.) Other facts bearing on separate issues are included below.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare*, 629 F.3d at 704.

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but

must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

### I. Discrimination Claims

Lee claims that defendants unlawfully terminated him and reduced his pension on the basis of his race (as prohibited by § 1981 and Title VII) and age (as prohibited by the ADEA). "A plaintiff may prove employment discrimination under the ADEA, Title VII, and § 1981 using either the direct method or indirect method." *Hutt* v. *AbbVie Products LLC*, 757 F.3d 687, 691 (7th Cir. 2014) (omission in original omitted). The direct method requires either direct—i.e., "smoking gun"—or circumstantial evidence allowing a jury to infer that the adverse action was motivated by a discriminatory intent. *See Dickerson* v. *Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011); *see also Walker* v. *Bd. of Regents*, 410 F.3d 387, 394 n. 7 (7th Cir. 2005). Under the indirect method, if a plaintiff can establish each element of a *prima facie* case, the burden then shifts to the defendant "to assert a legitimate, nondiscriminatory reason for the challenged action." *Goodwin* v. *Bd. of Trs.*, 442 F.3d 611, 617 (7th Cir. 2006); *Paluck* v. *Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000). Then, the plaintiff must rebut the nondiscriminatory reason "by presenting evidence that could enable the trier of fact to find that [the] reason is merely pretext for discrimination." *O'Regan* v. *Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). To demonstrate pretext, a plaintiff must show that an employer's reason for the adverse action "(1) has no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge." *Velasco* v. *Ill. Dept. of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir. 2001).

A.      **Disparate Treatment Racial Discrimination (§ 1981 and Title VII)**

The method of proving discrimination under § 1981 and Title VII is "essentially identical" and thus the same analysis applies to both statutes. *McGowan* v. *Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). Of course, a plaintiff need only survive under one method because defeating summary judgment under either is sufficient to proceed to trial where the distinction between the two methods disappears. *See Bunn* v. *Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) ("The indirect method of proof, which exists only to help plaintiffs survive summary judgment and falls away at the trial stage, follows a burden-shifting approach.").

1.      **Termination Claim**

a.      **Indirect Method**

As to Lee's termination, the analysis may be streamlined as there is no dispute that Lee can establish a *prima facie* case of discrimination, and there is no dispute that defendants have offered a legitimate, nondiscriminatory reason for the adverse actions. Therefore, defendants must demonstrate that there is no issue of material fact as to whether their proffered reasons are pretextual. *See Hudson* v. *Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004).

As indicated above, defendants aver that, as a result of CYC's financial difficulties, CYC needed to reduce its senior management team, which it did by eliminating Lee's position. Defendants justify Lee's termination, as opposed to another of the senior managers because Lee was the most expensive and his was the only position that could be absorbed by the remaining senior managers.[7]

---

[7] It is clear from the record that defendants never considered terminating Wells's President & CEO position during the 2011 reorganization. (*See, e.g.*, Defs.' LR 56.1, Ex. C, Wells Tr., Dep. Ex. 1 (considering for elimination and contrasting the Vice President of Finance & CFO, Vice President of

Lee's principal argument is that,[8] contrary to the reorganization plan's representation, other senior managers "possess[ed] the educational background or experience to perform two (2) key functions of [the Vice President of Program Operations] position: (1) provision of clinical supervision to among others, the Director of Mentor Services, and (2) oversight of both procurement and administration of grants from federal, state and local government agencies." (Defs.' LR 56.1, Ex. C, Wells Tr., Dep. Ex. 1.) Lee was capable of absorbing the duties of that position. While Lee argues that the first of these functions was not actually a requirement of the position, he ultimately argues that he was capable of performing both of these functions.

Taking the grant oversight function first, Lee argues that Lusk-Basick agreed with Lee's own assessment that he could perform this function as he had done for twenty years, and Wells admitted that Lee had the necessary education and experience to perform that role again. (*See* dkt. 153 at 7.) Lusk-Basick's testimony does little for Lee since she admitted that she lacked knowledge of the skills needed,[9] but Lee had in fact performed these duties in the past.

---

Development, Vice President of Development, Vice President of Program Operations, and Senior Vice President of Administration positions).)

[8] Lee also argues that (1) he was not the most expensive non-CEO senior manager, (2) CYC was not actually experiencing financial difficulties, and (3) that there is circumstantial evidence of CYC's discriminatory culture that would allow a jury to infer that its stated reason was pretextual. Since Lee's primary argument is sufficient to raise a question of fact as to whether his termination was pretextual, these remaining arguments are not addressed in connection with his racial discrimination claims.

[9] The relevant exchange is as follows:

> Q: And according to this document, the members of the CYC executive management team lacked the educational background and experience to provide oversight of procurement and administration of grants; right?
> A: Correct.
> Q: Do you know what educational background and experience Mr. Wells was referring to there?
> A: No, I don't.

(Defs.' LR 56.1, Ex. D, Lusk-Basick Tr. at 179:16–179:24.)

10

Defendants rightly complain that Lee distorts Wells's testimony by lifting snippets but, while the fuller quotations are not always the epitome of clarity (*see, e.g.*, Defs.' LR 56.1, Ex. C, Wells Tr. at 230:17–22), construed in Lee's favor, they indicate that Wells believed that Lee had the education and experience necessary to oversee the grant program.[10]

Despite Wells's admission, defendants nonetheless assert that neither Wells nor Lusk-Basick believed it made business sense for Lee to absorb Hansen's position or that Lee would be able to do so without missing a beat. In making these arguments, however, defendants offer reasons for terminating Lee that do not appear in the reorganization plan and, therefore, were not the stated basis for Lee's dismissal. These additional arguments are not sufficient for summary judgment because, "[i]f at the time of the adverse employment decision the decision-maker gave one reason, but at the time of the trial gave a different reason which was unsupported by the documentary evidence the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification." *Emmel* v. *Coca-Cola Bottling Co.*, 95 F.3d 627, 634 (7th Cir. 1996) (quoting *Perfetti* v. *First Nat'l Bank*, 950 F.2d 449, 456 (7th Cir. 1991)).

Defendants encounter a similar problem in arguing that Lee did not have the education or experience necessary to provide clinical supervision. As Lee points out there is some question as to whether clinical supervision was even a function of the Vice President of Program

---

[10] Wells explicitly so stated in his deposition:

> Q: [D]id he, Mr. Lee, possess the educational background and experience to perform those two key functions of the vice president of program operations position?
>
> A: The second one [i.e., procurement and administration of grants] he did. The first one, the use of the phrase "clinical supervision" is key. That was not his background, expertise, or credential, so he did not have that part."

(*Id.* at 233:10–20 (objection omitted).)

11

Operations.[11] Hansen initially testified that it was not part of his job and it does not appear that his job performance was ever evaluated with respect to the provision of clinical services. (Pl.'s LR 56.1 ¶ 69.)[12] Upon invitation from defendants' counsel, Hansen testified to performing certain functions—mainly overseeing the Comprehensive Community Based Youth Services (CCBYS) program—that could be considered clinical supervision. (*See* Defs.' Resp. LR 56.1 ¶ 69; *see also* Defs.' LR 56.1, Ex. H, Hansen Tr. 206:11–211:10.) However, even if one were to assume that overseeing the CCBYS program amounted to clinical supervision, there is no

---

[11] Lee also argues that Wells testified that CYC did not provide any clinical services. This construction of Wells's testimony, however, is only supported by viewing parts of Wells's testimony in complete isolation. For example, Lee cites to the following part of Wells deposition testimony to argue that CYC did not provide clinical services: "The youth centers that were what we call members of the centers were, again, there for youth development and activity-based and educational programs, college and career readiness. If they were experiencing issues that required clinical help, we would refer out for that. We did not have on-staff counselors for that purpose." (Defs.' LR 56.1, Ex. C, Wells Tr. at 45:13–19; *see also* Pl.'s LR 56.1 ¶ 68.) Here Lee is not stating that CYC provides no clinical services, as is clear from his testimony that begins on the next page of his deposition transcript:

> Q. And were those licensed social workers or licensed clinical social workers providing those kinds of services to the members, as you call them, of Chicago Youth Centers?
> A. Well, I think it would be -- I guess it would be most helpful to say that the clinical services that I was concerned about were provided to the children that were in the Mentoring Children of Prisoners program and the Comprehensive Community Based Youth Services programs. All of the other programs, it was a very small part of what occurred. But the clinical needs were in those two programs, and they were significant programs. That would be the most accurate way to put it.
> Q. So with the exception of those two programs—I just am trying to understand how the CYC worked.
> A. Uh-huh.
> Q. With the exception of those two programs, CYC did not provide clinical services, did it?
> A. That is correct.

(*See* Defs.' LR 56.1, Ex. C, Wells Tr. at 46:22–47:20.)

[12] During his deposition, Hansen was walked through his performance evaluations for his employment from July 1, 2005–June 30, 2012, and each time responded "No" when asked if there was anything in the evaluation "that suggests that your job performance was being reviewed with respect to the provision of clinical services or clinical supervision?" (Defs.' LR 56.1, Ex. H, Hansen Tr. at 49:12–61:17.)

indication that Lee did not have the education or experience to oversee that program since—as defendants were aware—Lee had overseen the program for twenty years. (Pl.'s LR 56.1 ¶ 127).[13]

As stated above, these were not the reasons stated in the termination plan so are evidence of pretext. Furthermore, Lee has proffered evidence of racial insensitivity and lack of diversity in higher positions that add strength to his claim that, since someone had to go, it should be Lee. Although this court is not to second-guess CYC's business decisions, there is sufficient evidence of pretextuality to create a genuine issue of material fact for trial.

Accordingly, defendants' motion for summary judgment with respect to Lee's § 1981 and Title VII disparate treatment termination claims is denied.

### 2. Pension Reduction Claim

Reduction in Lee's pension benefits was, at least in part, the result of forced retirement, which, if he prevails on his principal claim of discrimination, might affect the economic loss he suffered. Although there is little in the record to indicate that the application for distress termination was directed at Lee or his racial classification, because the court has denied summary judgment on the termination claim and the pension activity was within the same time frame, summary judgment will be denied on this claim as well.

---

[13] It is undisputed that the Vice President of Program Operations was not required to have an MSW (*see, e.g.*, Defs.' Resp. LR 56.1 ¶ 67) and that a CYC senior manager did not need to have a MSW to supervise the CCBYS program. (Pl.'s LR 56.1 ¶ 126; Defs.' Resp. LR 56.1 ¶ 126.) What CYC did understand to be required was that that the executive director of the CCBYS program needed to meet certain qualifications, and one of the way that these qualifications could be met was with an MSW and three years of experience in social work administration. (Defs. LR 56.1 ¶ 58.) In 2010 and 2011, CYC fulfilled this requirement by having Hansen serve as executive director of the CCBYS program. (*Id.*) As CYC understood its licensing requirements, therefore, it appears that CYC was merely using a senior manager to fulfill the executive director role, but there was nothing that required a senior manager to be an executive director. Further, defendants have conceded that they are unsure as to whether Lee could have served as the executive director of the CCBYS program based on one of the other criteria from the program. (Pl.'s LR 56.1 ¶ 133.)

13

## B. Disparate Impact Racial Discrimination (Title VII)

Defendants have also moved for summary judgment on Lee's Title VII disparate impact claim. Defendants argue that "Lee was the only African-American senior manager out of a very small group of senior managers. Lee cannot meet his burden to show disparate impact when only his position was at issue." (Dkt. 138 at 15.) Lee responds that his claim is not analogous to the single discharge cases cited by plaintiffs because the reorganization plan and the pension reduction were part of a coordinated event that overwhelmingly affected non-white CYC employees (through their termination and pension reduction) and local advisory board members, who were primarily people of color, by removing them from the CYC governance structure. (Dkt. 153 at 26–27.)[14]

Disparate impact liability is premised on the notion that a facially neutral policy results in discrimination against members of a protected class. *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 335 n. 15 & 336, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). It does not require proof of discriminatory intent, alleviating the plaintiffs' burden of proof compared to a disparate treatment claim. *See Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) ("If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited."). "To succeed on a disparate impact claim, plaintiffs bear the burden of showing that a particular employment practice causes a disparate impact on the basis of race." *Allen* v. *City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003) (quotations and citations omitted). While there is burden shifting in place for disparate impact claims, neither party discusses those prongs of the analysis. Rather both parties focus on

---

[14] Lee does not argue that even if his claim were considered to be a single-discharge disparate impact claim that he would nonetheless survive summary judgment. Rather, he only argues that defendants' cases are inapplicable because that is not the basis for his claim.

whether Lee can make a *prima facie* showing so as to survive summary judgment, which requires Lee to isolate and identify the specific employment practice and "establish causation by offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has" disparately impacted non-white CYC employees. *Puffer* v. *Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (alteration in original) (internal quotation marks and citations omitted).

Both parties devote a single paragraph to discussing this claim so the court will not dwell on it either. (*See* dkt. 138 at 14–15; *see also* dkt. 153 at 26–27.) Assuming that the reorganization plan is the facially neutral policy, Lee has not demonstrated through statistical evidence or otherwise how that policy fell more heavily on minorities on any basis other than that they were the majority of the employees and advisory board members affected. (*See* dkt. 153 at 26–27.) Furthermore, he does not even demonstrate with employee and advisory board records that this was, in fact, the racial balance of the organization. Although the record contains information as to the employees affected by the reorganization plan (*see* Defs.' LR 56.1 ¶ 45), Lee fails to identify the number of minority CYC employees who were not unfavorably affected in the reorganization.[15] In short, Lee has proffered insufficient evidence to make a prima facie showing under the disparate impact theory.

Accordingly, defendants' motion for summary judgment as to Lee's Title VII disparate impact claim is granted.

C.  **Age Discrimination (ADEA)**

Lee also argues that both his termination and pension reduction were a result of a discriminatory decision made by defendants based on Lee's age. At the time of his termination,

---

[15] Lee does discuss with some specificity the changes in the racial composition of the senior managers and of the Board of Directors (*see* Pl.'s LR 56.1 ¶¶ 148–52), however, this discussion does not resolve the above deficiencies nor does Lee appear even to be relying on these paragraphs in connection with his disparate impact claim.

Lee was 61 years of age. The employees (other than Wells) who assumed his duties were 45 (Lusk-Basick), and 54 (Hansen). Similarly to Lee's § 1981 and Title VII claims, Lee argues that he can survive under both the direct and the indirect methods of proof.

> 1. **Direct Method**

As discussed in connection with Lee's race discrimination claims, to survive summary judgment under the direct method, Lee must either provide direct or circumstantial evidence allowing a jury to infer that the adverse actions were motivated by a discriminatory ageist intent. In support, Lee alleges that he has direct evidence of discrimination because he was not considered as a candidate to replace Wells as CEO because Lee was considered by CYC to be at the "horizon" of his career. (Dkt. 28 at 24; Pl.'s LR 56.1 ¶ 153.)

Lee's characterization of the testimony is not entirely accurate, as Wells was discussing the fact that he was at the horizon of his own career and close to retirement age. (*See* Defs.' LR 56.1, Ex. C, Wells Tr. at 106:13–17.) While Wells was drawing a parallel between himself and Lee, he was doing so in the context of the CEO position—a position that Lee never applied for—not the Senior Vice President of Administration position that he was terminated from. This is not the type of "smoking gun" evidence of discrimination that constitutes direct evidence. Therefore, to the extent that the statement is relevant, it is the type of stray remark that may be relevant in trying to establish pretext, but is not sufficient to create a convincing mosaic of discriminatory intent. *See Gorence* v. *Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).[16] In fact, all of the evidence that Lee has in relation to his age discrimination claim

---

[16] The same is true of Wells's testimony that he thought he and Lee "were going to ride out into the sunset together," as it is unrelated to the adverse action. (*See* Lee's LR 56.1 ¶ 154.) Further, assuming Lee's argument relating to Hansen's testimony that Lee was not "adaptable" is an age-based comment, Hansen was not a decisionmaker in any of these events. *See Gorence*, 242 F.3d at 762 ("What our cases hold, we said, is that if someone not involved in the decisionmaking in a plaintiff's case

relates to pretext. Since the direct method requires more than a showing of pretext, Lee cannot survive summary judgment as to either his termination or pension reduction claim under the direct method. *See Van Antwerp* v. *City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010) ("We also note that, assuming [the plaintiff] marshaled enough circumstantial evidence to show pretext, his claim of discrimination under the direct method would still fail. Evidence offered under the direct method must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus." (internal quotation marks and citations omitted)).

Lee, therefore, can only survive summary judgment if he can do so under the indirect method, where pretext alone is enough.

### 2. Indirect Method

As with his race claim, Lee can show that he was a member of a protected class, that was performing his duties satisfactorily, and that he was terminated. In a mini-RIF case such as this, "where the dismissed employee's duties are absorbed by another employee or employees rather than eliminated, the court applies a modified version of the fourth prong of the prima facie case," which requires a showing that the discharged employee's "duties were absorbed by employees not in the protected class." *Petts* v. *Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008) (citations omitted).[17] Further, a plaintiff can satisfy the fourth prong of the mini-RIF inquiry if her duties were transferred mostly to substantially younger employees even if also in the

---

expressed discriminatory feelings, that is not evidence that the decision was discriminatory." (citing *Hunt* v. *City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000)).

[17] As the Seventh Circuit has explained, "the determinative factor in deciding whether the mini-RIF variation applies is whether the discharged employee's duties were absorbed by an existing employee or eliminated, not the number of employees let go." *Petts*, 534 F.3d at 725 (citing *Merillat* v. *Metal Spinners, Inc.*, 470 F.3d 685, 690 n.1 (7th Cir. 2006) and *Paluck* v. *Gooding Rubber Co.*, 221 F.3d 1003, 1011 n.5 (7th Cir. 2000)).

protected class. *Balderston* v. *Fairbanks Morse Engine Div. of Coltect Indus.*, 328 F.3d 309, 321–22 (7th Cir. 2003); *Wells* v. *EMF Corp.*, 757 F. Supp. 2d 791, 802 (N.D. Ind. 2010) (collecting cases from district courts in the Seventh Circuit discussing the "mostly transferred" requirement). Here, the three individuals who absorbed Lee's duties were also within the protected class of forty and older, one was older[18] and the other two were sixteen and seven years younger. The facts viewed in the light most favorable to Lee and drawing all reasonable inferences in his favor, permit the inference that most of his job responsibilities were transferred to the one substantially younger employee, allowing Lee to make out his *prima facie* case. Considering that the only older employee was Wells (who as discussed above was not being considered for termination as part of the mini-RIF) and that Lee was the closest to retirement age, a reasonable jury could infer that Wells looked on Lee as the preferred choice for termination because he was the closest to retirement in any event.[19] Although evidence of pretext is indeed thin, because the case is to go to trial, the court allows this claim to proceed.

Accordingly, defendants' motion for summary judgment as to Lee's ADEA claims is denied.

## II. Tortious Interference With A Contract And Business Expectancy

Defendants argue that "Wells cannot be liable for tortious interference because he was not acting as an outside third party." (Dkt. 138 at 15.) Lee responds that defendants have misstated the law and their motion as to these two claims should be denied. (*Id.*) Lee has the better view of the law. As he points out, in *Castro* v. *Total Home Health, Inc.*, Judge Guzman

---

[18] Lee does not specifically identify Wells's age, but this appears to be a non-issue since it appears that Wells is in fact older than Lee. (Defs.' LR 56.1, Ex. C at 81:22–82:8.)

[19] As discussed in connection with Lee's race discrimination claim, his forced retirement could have had an economic effect on his pension benefits. Therefore, summary judgment is denied as to Lee's ADEA pension reduction claim as well.

rejected the argument defendants raise here in the motion to dismiss context:

> Defendants argue that, as employees of Total, they may not be held liable for wrongful interference with Plaintiff's business relationship with Total because they were acting on behalf of Total, and a corporate employee generally will not be held liable for interference when he is acting in the employer's interests. However, corporate officers do not enjoy a qualified privilege for their actions when they 'act solely for their own gain or solely for the purpose of harming plaintiff since such conduct is not undertaken to further the corporation's interest.'"

No. 03 C 8486, 2004 WL 1588261, at *5 (N.D. Ill. July 9, 2004) (internal citations omitted) (quoting *Mittelman* v. *Witous*, 552 N.E. 2d 973, 987, 135 Ill. 2d 220, 142 Ill. Dec. 232 (1989)); *see also PTR, Inc.* v. *Forsythe Racing, Inc.*, No. 08 C 5517, 2009 WL 1606970, at *3 (N.D. Ill. June 9, 2009) (noting same in the context of tortious interference with contracts).

To be clear, Lee does not argue that he has presented evidence sufficient to establish a question of fact as to these claims or that defendants are not otherwise entitled to judgment as a matter of law. (*See id.*) As such, it is a little curious that defendants—who make no attempt in reply to distinguish Lee's case law—frame Lee's argument as if Lee contends that he has presented sufficient evidence to prove his claims. (*See* dkt. 161 at 24.) They then argue that Lee has not articulated a single fact that would support either of these claims. (*See id.*) In his motion to strike, Lee takes issue with this approach and argues that it is an improper argument raised for this first time in a reply brief. (Dkt. 164 at 3–4.)

"Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary." *Modrowski* v. *Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex*, 477 U.S. at 323). After doing so, the burden then shifts to the non-movant to demonstrate why there is a genuine issue of material fact that necessitates going to trial. *Id.* Here defendants sought to satisfy their

initial burden by arguing as a matter of law that Wells could not be liable for tortious interference because he was not acting as a third party. It is perfectly permissible to move for summary judgment by pointing to a lack of proof in the record. *See id.* at 1168–70 (noting that the burden shifted to the plaintiff to present proof of its claim after the defendant moved for summary judgment on the ground that, because of the plaintiff's failure to take discovery, there was a complete lack of proof concerning the essential elements of the plaintiff's claims). But that is not the basis on which defendants moved for summary judgment. Having moved for summary judgment as a matter of law and Lee having rebutted that legal basis, the burden never shifted to Lee to present proof of his tortious interference claims.

Accordingly, defendants' motion for summary judgment for tortious interference is denied.[20]

### CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment (dkt. 137) is granted in part and denied in part. Defendants' motion is granted as to Lee's Title VII disparate impact claim. Defendants' motion is denied as to Lee's § 1981 and Title VII disparate treatment claims, ADEA claims, and tortious interference claims. Lee's motion to strike (dkt. 164) is granted in part and denied as moot in part and defendants' motion for reconsideration (dkt. 167) is denied as moot since the court received it as a response to Lee's motion to strike. This case will be called on April 19, 2016 at 11 a.m. for a status hearing.

Date: March 31, 2016

_____
U.S. District Judge Joan H. Lefkow

---

[20] Prior to trial, however, Lee should consider whether he should dismiss this claim inasmuch as he has not indicated that he has any proof.